# LOAN AGREEMENT

This Loan Agreement is made on the 30th day of September, 2015 between

**Orient Alliance Shipping Company Limited,**
whose registered office is at 171, Old Bakery Street,
Valletta, Malta

-     hereinafter called the "Borrower" -

on the one side

**and**

**HELLENIC BANK PUBLIC COMPANY LIMITED,**
whose registered office is at Corner Limassol & Athalassa Avenue, Nicosia, Cyprus, acting through its branch at 131 Arch. Makarios Avenue, 2nd Floor, 3508 Limassol, Cyprus

- hereinafter referred to as the "Bank" -

on the other side

CHRYSSES DEMETRIADES & CO. LLC
13 Karaiskakis Street
3032 Limassol, Cyprus

EXHIBIT 1

**WHEREAS** the Borrower has requested the Bank to grant to the Borrower a loan facility in the aggregate amount of up to United States Dollars twenty million five hundred thousand (USD20,500,000.00) for the purpose of part-refinancing the purchase/acquisition costs of the Vessel (as defined below) and permanently reducing the Interorient Overdraft (as defined below); and

**WHEREAS** the Bank is prepared to grant such loan to the Borrower upon the terms and conditions set out in this Loan Agreement.

**NOW IT IS HEREBY AGREED** as follows:

1.    **Definitions/Interpretation**

"Account" means the account(s) defined in Clause 9.

"Banking Day" means a day on which banks are open for business transactions in Cyprus and in the centre or centres appropriate for the currency in which a drawing of the Loan or any part thereof is to be made or in which the Outstanding Indebtedness is outstanding, as the case may be.

"Basel Rules" means the policy guidelines on credit risk measurement methods issued by the Basel Committee and/or corresponding EU/EEA legislation from time to time in force and applicable to a bank through national implementation.

"Borrowed Money" means Financial Indebtedness in respect of (i) money borrowed or raised and debit balances at banks, (ii) any bond, note, loan, loan stock, debenture or similar instrument, (iii) acceptance or documentary credit facilities, (iv) receivables sold or discounted (other than on a non-recourse basis), (v) deferred payments for assets or services acquired, (vi) finance leases and hire purchase contracts, (vii) swaps, forward exchange contracts, futures and other derivatives, (viii) any other transaction (including without limitation, forward sale or purchase agreements) having the commercial effect of a borrowing or raising of money or of any of (ii) to (vii) above and (ix) guarantees in respect of Financial Indebtedness of any person falling within (i) to (viii) above.

"Borrower's Guarantee" means the guarantee and indemnity to be executed by the Borrower to and in favour of the Bank securing the Orient Tribune Loan and all obligations and liabilities by Orient Tribune under the Orient Tribune Loan Agreement and under the other Security Documents (as defined in the Orient Tribune Loan Agreement) to which Orient Tribune is or is to be a party, up to the

principal amount of United States Dollars twenty million five hundred thousand (USD20,500,000.00) plus interest, default interest, commission, charges, fees and costs, in a form acceptable to the Bank.

"Classification Society" means an IACS member classification society or such other first rate classification society which the Bank shall at the request of the Borrower have agreed in writing to be treated as the Classification Society for the purposes of the Security Documents.

"Commitment" means the amount of up to United States Dollars twenty million five hundred thousand (USD20,500,000.00).

"Commitment Termination Date" means 7th October 2015 or such later date as the Bank may in its absolute discretion agree in writing.

"Default" means any Event of Default or any event or circumstance which with the giving of notice or passage of time or both would constitute an Event of Default.

"Drawdown" means the advance and/or the making available of either Tranche by the Bank to the Borrower.

"Drawdown Date" means the value date with effect to which a Drawdown is made.

"Drawdown Date A" means the date on which Tranche A is advanced and/or made available by the Bank to the Borrower.

"Drawdown Date B" means the date on which Tranche B is advanced and/or made available by the Bank to the Borrower.

"Encumbrance" means any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, trust arrangement or security interest or other encumbrance of any kind securing any obligation of any person or any type of preferential arrangement (including without limitation, title transfer and/or retention arrangements having a similar effect).

"Euro" and "EUR" means the lawful currency for the time being of the member states of the European Monetary Union.

"Event of Default" means any of the events specified in Clause 20.

"Financial Indebtedness" means any obligation for the repayment of money, whether as principal or as surety and whether present or future, actual or contingent.

"General Assignment" means a first priority general assignment of all insurances, earnings and any requisition compensation of the Vessel, to be executed by the Borrower in favour of the Bank, substantially in the form of **Attachment "C"** hereto or in any other form acceptable to the Bank.

"General Hypothec" means a first priority Maltese law general hypothec in respect of all assets of the Borrower, to be executed by the Borrower in favour of the Bank, substantially in the form of **Attachment "D"** hereto or in any other form acceptable to the Bank.

"Guarantee A" means a guarantee and indemnity to be executed by Interorient to and in favour of the Bank securing the Loan and all obligations and liabilities of the Borrower under this Loan Agreement and under the other Security Documents to which the Borrower is or is to be a party, up to the principal amount of United States Dollars twenty million five hundred thousand (USD20,500,000.00) plus interest, default interest, commissions, charges, fees and costs, substantially in the form of **Attachment "A1"** hereto or in any other form acceptable to the Bank.

"Guarantee B" means a guarantee and indemnity to be executed by Path to and in favour of the Bank securing the Loan and all obligations and liabilities of the Borrower under this Loan Agreement and under the other Security Documents to which the Borrower is or is to be a party, up to the principal amount of United States Dollars twenty million five hundred thousand (USD20,500,000.00) plus interest, default interest, commission, charges, fees and costs, substantially in the form of **"Attachment A2"** hereto or in any other form acceptable to the Bank.

"Guarantee C" means a guarantee and indemnity to be executed by Orient Tribune to and in favour of the Bank securing the Loan and all obligations and liabilities of the Borrower under this Loan Agreement and under the other Security Documents to which the Borrower is or is to be a party, up to the principal amount of United States Dollars twenty million five hundred thousand (USD20,500,000.00) plus interest, default interest, commission, charges, fees and costs, substantially in the form of **"Attachment A3"** hereto or in any other form acceptable to the Bank.

"Guarantees" means Guarantee A, Guarantee B and Guarantee C and in the singular "Guarantee" means any one of them.

"Guarantors" means Interorient, Path and Orient Tribune and in the singular "Guarantor" means any one of them..

"Initial Market Value of the Vessel" means the market value of the Vessel determined in the Initial Vessel Valuation.

"Initial Vessel Valuation" means the written valuation of the market value of the Vessel provided by an internationally well reputed independent ship sale and purchase broker acceptable to the Bank and appointed by, and at the cost of, the Borrower, such valuation being made with or without physical inspection (to be stated in the valuation) and on the basis of an arms-length transaction between a willing buyer and a willing seller without taking into account any charter party or other employment of the Vessel and such broker being instructed to deliver the Initial Vessel Valuation to the Bank prior to the Drawdown of Tranche A under this Loan Agreement.

"Interest Payment Date" means the date on which interest is due and payable pursuant to Clause 7(D).

"Interest Period" means each successive period the commencement and length of which shall be determined in accordance with Clause 7 hereof and for which a rate of interest is to be established.

"Interest Rate" means the rate of interest applicable to the Loan or any part thereof as provided for in Clause 7(A).

"Interorient" means Interorient Navigation Company Limited whose registered office is at 142 Franklin Roosevelt, 3011 Limassol, Cyprus.

"Interorient Account" means Interorient's account no. 219-07-187207-02 with the Bank relating to the Interorient Overdraft.

"Interorient Loan" means the term loan no. 219-06-187207-01 originally in the amount of United States Dollars thirty million seven hundred seventy three thousand nine hundred sixty (USD30,773,960.00) granted by the Bank to Interorient.

"Interorient Overdraft" means the overdraft facility with account number 219-07-187207-02 made available by the Bank to Interorient originally with a limit of up to United States Dollars seventeen million (USD17,000,000.00) and an extraordinary limit of United States Dollars one hundred fifty thousand (USD150,000.00).

"LIBOR" means the rate of interest for loans in the currency of the Loan, published by the British Bankers' Association for a period equal to the Interest Period which appears on Reuters Page LIBOR= (or such other page or service as may replace Reuters) as at 11:00am London time on the day that is 2 (two) Banking Days prior to the commencement of the relevant Interest Period. In case no such rate as mentioned above is published, the rate at which the Bank, in accordance with its normal practice, is offered such deposits in the London Interbank Market.

"Loan" means the loan facility in the aggregate amount of up to United States Dollars twenty million five hundred thousand (USD20,500,000.00), comprising of the aggregate of Tranche A and Tranche B and the term Loan shall, where the context so requires or permits, mean the principal amount thereof from time to time outstanding in the currency or currencies in which it is outstanding.

"Loan Agreement" means this agreement.

"Loan to Value Shortfall" means at any relevant time the amount by which the outstanding principal amount of the Loan drawn down by the Borrower exceeds 75% (seventy five per cent) of the Relevant Market Value of the Vessel.

"London Interbank Market" means the London interbank market.

"Material Adverse Effect" means any event or circumstance which, in the opinion of the Bank:

(a)     is likely to materially and adversely affect the Borrower's ability to perform or otherwise comply with all or any of its obligations under this Loan Agreement and/or any of the other Security Documents; or

(b)     is likely to materially and adversely affect the business, operations, property, condition (financial or otherwise) or prospects of the Borrower; or

(c)     is likely to result in this Loan Agreement and/or any of the other Security Documents not being legal, valid and binding on, and enforceable in accordance with its terms against, the Borrower,

and the same meaning shall be attributed to this term in relation to any of the other Obligors.

"Mortgage" means a first priority Maltese statutory mortgage in account current form and a deed of covenants collateral thereto over and in respect of the Vessel to be executed by the Borrower in favour of the Bank, substantially in the form of **Attachment "B"** hereto or in any other form acceptable to the Bank, securing (inter alia) all the obligations and liabilities of the Borrower under (inter alia) this Loan Agreement and the Borrower's Guarantee.

"Nordea Bank" means Nordea Bank Danmark A/S of Christiansbro, Strandgade 3, P.O. Box 850, DK-0900 Copenhagen C, Denmark, as agent on behalf of itself and Danish Ship Finance A/S (Danmark Skibskredit A/S) of Sankt Annae Plads 3, 1250 Copenhagen K, Denmark..

"Nordea Loan" means the loan facility originally in the amount of United States Dollars eighteen million one hundred eighty seven thousand five hundred (USD18,187,500.00) made available by Nordea Bank to the Borrower for the part-financing of the purchase/acquisition costs of the Vessel.

"Obligors" or "Security Parties" means the Borrower, the Guarantors and all other parties to the Security Documents other than the Bank, and in the singular "Obligor" or "Security Party" means any one of them.

"Operating Account" means the account defined in Clause 15(A)(h).

"Orient Tribune" means Orient Tribune Shipping Company Limited whose registered office is at 3 Thaleias Street, 3011 Limassol, Cyprus.

"Orient Tribune Loan Agreement" means the loan agreement dated 21 December 2009 between Orient Tribune, as borrower and the Bank, as lender as the same has been or may from time to time be amended and/or supplemented.

"Orient Tribune Loan" means the loan facility originally in the amount of up to United States Dollars twenty two million five hundred seventy five thousand (USD22,575,000.00) made available by the Bank to Orient Tribune pursuant to the Orient Tribune Loan Agreement for the purpose of part-financing the purchase/acquisition and equipment costs of the Orient Tribune Vessel; and the expression Orient Tribune Loan means and includes the outstanding balance of the said loan in the currency or currencies in which the same is outstanding, at any given time.

"Orient Tribune Vessel" means the vessel bearing IMO No. 9467603 which is presently registered in the name and ownership of Orient Tribune under the Cyprus flag and under the name "ORIENT TRIBUNE".

"Outstanding Indebtedness" means the aggregate of the Loan, accrued interest thereon and any other moneys whatsoever from time to time due, owing or payable, actually or contingently, presently or in the future, to the Bank under this Loan Agreement and/or the other Security Documents or any of them.

"Path" means Path Developments Limited whose registered office is at 142 Franklin Roosevelt, 3011 Limassol, Cyprus.

"Permitted Encumbrance" means any Encumbrance in favour of the Bank created pursuant to the Security Documents and Permitted Liens.

"Permitted Liens" means any lien on the Vessel for master's, officer's or crew's wages outstanding in the ordinary course of trading, any lien for salvage and any ship repairer's or outfitter's possessory lien for a sum not (except with the prior written consent of the Bank) exceeding 5% of the hull insured value of the Vessel.

"Quotation Date" means the date two (2) Banking Days prior to the beginning of any Interest Period.

"Related Company" means any subsidiary of the Bank, any company or other entity of which the Bank is a subsidiary and any subsidiary of any such company or entity.

"Relevant Market Value of the Vessel" means (a) for the period beginning from the date of this Loan Agreement up to the drawdown of Tranche B, the Initial Market Value of the Vessel and (b) for the period beginning from the day the drawdown of Tranche B, the market value of the Vessel to be prepared at any relevant time pursuant to Clause 13(A) hereof.

"Repayment Dates" means the dates on which the Repayment Instalments shall be paid, as described in Clause 5 hereof.

"Repayment Instalment" means any of the repayment instalments described in Clause 5 (A) hereof.

"Security Documents" means this Loan Agreement, the Guarantees, the Mortgage, the General Assignment and the General Hypothec and all other documents

referred to in Clause 11 hereof, as the same may from time to time be amended, supplemented, varied or novated.

"Spot" refers to the settlement of a trade between two currencies, which would take place two clear business days (in the countries of the currencies being traded) after the date on which the transaction was agreed at the rate of exchange the Bank would, in the ordinary course of business, have sold one currency for the other.

"Taxes" means all taxes (including, but without limitation, income, ad valorem, capital gains, value added, service, sales, excise, franchise, stamp, property or other taxes), levies, imposts, duties, charges withholdings, assessments, penalties, fines, interest on tax, all licence and registration fees and any other governmental, quasi-governmental or official charges wheresoever and by whomsoever imposed.

"Term of the Loan" means the period during which the Loan will be granted by the Bank to the Borrower, such period beginning from the day on which Tranche A is drawn down hereunder and ending on 30 June 2032.

"Total Loss" means:-

(a)  actual or constructive or compromised or agreed or arranged total loss of the Vessel.

(b)  requisition for title or other compulsory acquisition of the Vessel other than requisition for hire;

(c)  capture, seizure, arrest, restraint, detainment, detention or confiscation of the Vessel by any government or by persons acting or purporting to act on behalf of any government unless the Vessel be released and restored to the Borrower from such capture, seizure, arrest, restraint, detainment, detention or confiscation within thirty (30) days after the occurrence thereof.

"Tranche A" means the part of the Loan in an amount of up to United States Dollars ten million six hundred fifty eight thousand one hundred seventy eight and thirty three cents (USD10,658,178.33), and the term Tranche A shall, where the context so requires or permits, mean the principal amount thereof from time to time outstanding in the currency or currencies in which it is outstanding.

"Tranche B" means the part of the Loan representing the balance of the Commitment after deducting the actual amount drawn down under Tranche A, and the term Tranche B shall, where the context so requires or permits, mean the

principal amount thereof from time to time outstanding in the currency or currencies in which it is outstanding.

"Tranches" means collectively Tranche A and Tranche B and in the singular "Tranche" means either of them.

"United States Dollars" and "USD" means the lawful currency of the United States of America for the time being.

"USD Currency Amount" means the amount in United States Dollars which would have been outstanding during the relevant Interest Period, had the Loan or any part thereof been made available and remained outstanding in United States Dollars.

"Vessel" means the 33,500 deadweight log/bulk carrier vessel bearing IMO No. 9496331 registered in the name and ownership of the Borrower under the laws and flag of Malta and under the name "ORIENT ALLIANCE" or any other name.

In this Loan Agreement:-

(1)     Headings are for convenience of reference only.

(2)     Where the context permits, the singular includes the plural and vice versa.

(3)     Any reference to any other document, is to be construed as a reference to such document as amended, supplemented, novated, varied or replaced from time to time.

(4)     References to any enactment or statutory provision shall be construed as references to such enactment or provisions as replaced or amended or re-enacted from time to time.

(5)     References to persons include bodies corporate and unincorporated.

**2.     The Loan**

(A)     The Bank agrees to make available to the Borrower during the period from the date hereof up to and including the Commitment Termination Date and subject to the terms and conditions of this Loan Agreement the Loan up to the amount of the Commitment.

(B)   The Loan is to be utilized solely for the purpose of part-refinancing the purchase/acquisition costs of the Vessel by the Borrower and for permanently reducing the Interorient Overdraft as follows:

    (i)   Tranche A for part-refinancing the purchase/acquisition costs of the Vessel, to be remitted by the Bank on the account of the Borrower to Nordea Bank on Drawdown Date A for the repayment/payment of the Nordea Loan and all other amounts due to Nordea Bank by the Borrower in relation to the Nordea Loan; and

    (ii)   Tranche B for permanently reducing the Interorient Overdraft, to be remitted by the Bank on the account of the Borrower and to be credited to the Interorient Account on Drawdown Date B;

(C)   Each Tranche will be disbursed and/or be made available in one amount only after all conditions of this Loan Agreement applicable to such Tranche as specified in Clause 3(B) hereinbelow have been fulfilled.

(D)   Neither the Loan nor any Tranche nor any part thereof shall be available for drawing after the Commitment Termination Date.

## 3.   Availability

(A)   Upon satisfaction of the relevant conditions set out in Clause 3(B) below, each Tranche shall be made available by the Bank to the Borrower under the terms of this Loan Agreement during the period from the date hereof up to and including the Commitment Termination Date.

(B)   The Loan shall be made available in the manner and upon the Borrower's compliance with the terms and conditions set out hereinbelow:

    (a)   It is a condition precedent to any Drawdown that the Bank shall have received not less than three (3) Banking Days prior to the proposed Drawdown Date the following in form and substance satisfactory to the Bank:

        (i)   a counterpart of each of this Loan Agreement, the other Security Documents and the Borrower's Guarantee duly signed on behalf of the Borrower and the other Security Parties;

(ii) originals or certified copies of any consent necessary (if any) from governmental or other authorities for the execution and performance by the Borrower and the other Security Parties of this Loan Agreement, the other Security Documents and the Borrower's Guarantee to which each of them is or is to become a party;

(iii) evidence that the Borrower is a company duly organised and existing under the laws of Malta and that each other Security Party is a company duly organised and existing under the laws of the Republic of Cyprus;

(iv) a copy of the Memorandum and Articles of Association of each of the Security Parties certified as a true copy by its secretary or any of its directors;

(v) an original of the resolutions of the board of directors of each of the Security Parties approving and authorising the entry into those of the Security Documents and, in the case of the Borrower, the Borrower's Guarantee to which such Security Party is or is to become a party;

(vi) a power of attorney of the Borrower appointing an attorney or attorneys for the execution of this Loan Agreement, for signing the written notices of drawdown and the grant of the Borrower's Guarantee and those of the Security Documents to which the Borrower is or is to become a party;

(vii) a power of attorney of each other Security Party appointing an attorney or attorneys for the execution of those of the Security Documents to which such Security Party is or is to become a Party;

(viii) satisfactory evidence in respect of the registration of the Vessel under the Maltese flag in the ownership of the Borrower free and clear of liens, mortgages (other than the Mortgage) and other Encumbrances;

(ix) evidence that the Mortgage has been duly registered with first priority over the Vessel at the Maltese Ships Register;

(x) the Classification Society's confirmation of class for hull and machinery showing that the Vessel is in class free of recommendations;

(xi)   the notice of assignment of the insurances of the Vessel issued pursuant to the General Assignment having been notified by the Borrower to the relevant brokers and insurers; and

(xii)   legal opinions by the Bank's lawyers in Cyprus and Malta in relation to the provisions contained in Clause 16 of this Loan Agreement or any other legal matter the Bank may request.

For the avoidance of any doubt, it is hereby agreed and acknowledged by the parties hereto that the documents listed under sub-paragraphs (i) to (xii) (both inclusive) of this Clause 3(B)(a) received by the Bank in respect of Tranche A will not have to be repeated in respect of Tranche B.

(b)   Tranche A may be drawn on any Banking Day during the period from the date hereof up to and including the Commitment Termination Date, provided the conditions set out in Clause 3(B)(a) above have been met and further provided the Bank shall have received in form and substance satisfactory to it not less than three (3) Banking Days prior to Drawdown Date A:

(i)   an irrevocable written notice of drawdown by the Borrower specifying the amount to be drawn on Drawdown Date A; and

(ii)   the Initial Vessel Valuation;

(c)   Tranche B may be drawn on any Banking Day during the period from the Drawdown Date A up to and including the Commitment Termination Date, provided that the conditions set out in Clauses 3(B)(a) and (b) above have been met and further provided that Tranche A shall have been drawn down and the Bank shall have received in form and substance satisfactory to it not less than three (3) Banking Days prior to Drawdown Date B an irrevocable written notice of drawdown by the Borrower specifying the amount to be drawn on Drawdown Date B.

(d)   The Drawdown of either Tranche shall only be permitted if the Bank shall not have determined prior to 11.00 a.m. Cyprus time on the Quotation Date prior to the Drawdown Date of that Tranche that the Bank is unable to obtain deposits in United States Dollars in the London Interbank Market in a sum necessary to fund the relevant Tranche.  In such case the procedure as referred to in Clause 4 shall apply.

(e)    The Bank may, in its sole discretion, (i) extend the period for delivery of any of the documents referred to above on such conditions as it thinks fit in accordance with a relevant notice in writing to the Borrower and (ii) require any copy of a document to be certified as a true copy and/or that, in respect of any document, it is provided with an original thereof.

(f)    Either Tranche or part thereof remaining undrawn at the Bank's close of business on the Commitment Termination Date shall be deemed cancelled.

## 4.    Substitute Basis

(A)    In the event that by reason of any change in financial, political or economic conditions or in currency exchange rates or exchange controls it becomes impossible for the Bank to fund or continue to fund the Loan or any part thereof in United States Dollars or if for any reason the Bank determines that deposits in United States Dollars are unavailable to the Bank in the London Interbank Market for the relevant Interest Period, the Bank shall give notice to the Borrower to that effect and shall, by such notice, certify to the Borrower an alternative basis (the "Substitute Basis") for maintaining the Loan or any part thereof.  Such Substitute Basis may include an alternative method of fixing the rate of interest (which shall reflect the cost to the Bank of (i) funding the Loan or any part thereof from other sources plus (ii) the margin (as referred to in Clause 7(A)) and/or alternative currencies for the Loan or any part thereof, and in establishing such Substitute Basis the Bank shall have regard to the reasonable wishes of the Borrower and shall use to the extent it is reasonably possible its best efforts to reduce its costs of funding the Loan.

(B)    The Borrower shall notify the Bank in writing within five (5) Banking Days of receipt of such certificate from the Bank whether or not it accepts such Substitute Basis.  If the Borrower so accepts, such Substitute Basis shall apply in accordance with its terms.  If the Borrower does not accept or does not notify whether or not it accepts as aforesaid the Borrower shall forthwith prepay to the Bank the Loan or the relevant part thereof to which this Clause 4 applies together with interest thereon as set out in such Substitute Basis and all other amounts outstanding under this Loan Agreement.

(C)    As long as the Loan or any part thereof is maintained on the Substitute Basis, the Bank, in consultation with the Borrower, may from time to time review whether the circumstances are such that the Loan or the respective part thereof may be funded again in United States Dollars.

(D)     If a Substitute Basis comes into effect, the Borrower agrees to execute, deliver, record and endorse at its own expense amendments to the Security Documents reflecting the same and such other documents as the Bank shall reasonably request in order to maintain the validity of any of the Security Documents.

## 5.     Repayment

(A)     Subject to the provisions of this Loan Agreement, the Borrower shall be given a grace period of twenty four (24) months in relation to the repayment of the principal amount of the Loan and thereafter the Loan shall be repaid by fifty eight (58) consecutive equal quarterly regular repayment instalments each of United States Dollars three hundred thousand (USD300,000.00) (each a "Repayment Instalment"), the first such Repayment Instalment being due and payable on 31 December 2017, the next fifty seven (57) Repayment Instalments being due and payable at three (3) months intervals thereafter (the final and fifty eighth (58th) Repayment Instalment shall be due and payable by the Borrower to the Bank on 31 March 2032) and on the day falling at the end of the Term of the Loan the Borrower shall pay to the Bank a balloon payment in the amount of United State Dollars three million one hundred thousand (USD3,100,000.00) together with all other amounts forming part of the Outstanding Indebtedness being due and payable on  the day falling at the end of the Term of the Loan.

(B)     If any payment hereunder shall not be effected within fourteen (14) calendar days of its due date then upon written notice of default of the Bank to the Borrower the Outstanding Indebtedness shall become immediately due and payable and any undrawn amount shall be cancelled. A delay or omission of the Bank to send a written notice of default at the time shall not operate as a waiver nor shall it preclude the Bank from demanding repayment of the outstanding balance of the Loan and accrued interest thereon and all amounts due hereunder and/or under the other Security Documents at any later time.

## 6.     Prepayment

(A)     In case the Vessel is sold with the prior written consent of the Bank (which shall not be unreasonably withheld) during the Term of the Loan, the Loan or any outstanding balance thereof and any other amounts due under this Loan Agreement and the other Security Documents shall be due and payable on or before the delivery of the Vessel to the purchasers.

(B)     Prepayments of the Loan in whole or in part, but in an amount not less than USD100,000.00 (or the equivalent thereof if the Loan is outstanding in any other currency so calculated at the Bank's spot rate of exchange ten (10) Banking Days before such prepayment is intended to be made), are allowed on the last Banking Day of any Interest Period, provided that the Borrower gives to the Bank a ten (10) Banking Days prior written notice stating the amount, the currency and date of such a prepayment. Any notice of prepayment given by the Borrower shall be irrevocable and the Borrower shall be bound to prepay in accordance with such notice. If for any reason the Borrower makes any prepayment, the prepaid amount will be applied by the Bank first towards the final repayment Instalment and thereafter towards the other Repayment Instalments of principal of the Loan in the inverse order of maturity. Prepayments entitle the Borrower – provided the economic necessity is evidenced to the Bank – to demand the later suspension of a regular corresponding Repayment Instalment provided the total amount of the Loan according to the repayment schedule is not increased and such suspension does not exceed the Term of the Loan.

(C)     In case the Bank receives an obligatory or voluntary prepayment for any reason whatsoever on a day other than the last Banking Day of the current Interest Period relating to such amount, the Borrower shall, subject to paragraph (D) below, pay to the Bank a prepayment fee equal to 2% (two per cent) on the amount prepaid for the period until the end of the Interest Period in which the prepayment took place.

(D)     In case any surplus is accumulated from the time charter earnings of the Vessel and the Orient Tribune Vessel after deduction of the operating expenses (including any expenses for dry-docking) of the Vessel and the Orient Tribune Vessel and the repayment of the Loan, such surplus shall be diverted to and credited towards (at the Bank's discretion) the Loan and/or the Orient Tribune Loan and/or the Interorient Loan. No early repayment fees will be charged by the Bank in any such case.

(E)     Any amounts prepaid cannot be re-borrowed by the Borrower.

**7.     Interest and Interest Periods**

(A)     Subject to the terms of this Loan Agreement, the rate of interest applicable to the Loan (or any part thereof) for each Interest Period shall be the rate per centum per annum ("Interest Rate") in respect of the Loan or the relevant part thereof outstanding hereunder at the rate to be determined by the Bank at each relevant time in accordance with applicable laws to be three (3) months LIBOR plus a margin of three point one six six five per centum (3. 1665%) per annum (the "Margin").

At any time during the Term of the Loan the Bank and the Borrower may agree on an increase of the Margin and by a relevant notice in writing by the Bank to the Borrower such increased Margin shall be applicable to the Loan as from the next Interest Perion following such notice by the Bank to the Borrower.

At any time during the Term of the Loan the Bank may reduce the Margin by giving to the Borrower a notice in writing and such reduced Margin shall be applicable to the Loan as from the next Interest Period following such notice by the Bank to the Borrower.

(B) Each Interest Period shall be six (6) months and if it would end on a day which is not a Banking Day, that Interest Period shall be extended to the next succeeding day which is a Banking Day, unless the result of such extension would be to carry such Interest Period over into another calendar month, in which event such Interest Period shall end on the preceding Banking Day.

(C) If the Bank certifies in writing to the Borrower that due to the conditions prevailing in the London Interbank Market or that otherwise it is not reasonably practicable to it to apply the six (6) months Interest Period, the duration of an Interest Period shall be as fixed by the Bank acting in consultation with the Borrower, and notified to the Borrower.

(D) Interest on the Loan or any part thereof is due and payable in arrears on 30 June and 31 December of each calendar year starting from 31 December, 2015 (the "Interest Payment Date(s)"). If 30 of June or 31 December of any year when interest is payable is not a Banking Day then the interest shall be due and payable on the preceding Banking Day.

(E) Interest on the Loan shall be calculated on the basis of the actual number of days elapsed divided by a 360-days-year.

(F) Each determination of the Interest Rate, applicable from time to time, made by the Bank in accordance with this Loan Agreement shall be final and conclusive.

(G) Interest shall be capitalized and added to the principal amount of the Loan twice a year on 30 June and 31 December of each calendar year or at such other intervals as permitted by applicable legislation of the Republic of Cyprus to be notified by the Bank to the Borrower in writing at the relevant time.

(H)   Should any amount not be paid when due under the terms of this Loan Agreement then, without prejudice to the Bank's rights under Clause 20 hereof, the Borrower shall pay on the Bank's first written demand, interest on such overdue amount from the due date until the actual date of payment thereof at a rate of 2% (two per cent) per annum above the Interest Rate applicable to the Loan (or the relevant part thereof in the currency of such unpaid amount, as the case may be) immediately prior to default in payment. Such interest shall be compounded six-monthly, in arrears, until the Bank has received payment in full.

## 8.   Fees

Upon the signing of this Loan Agreement (a) a fee of EUR100,000.00 for the Bank's arranging the Loan and (b) a fee of EUR1,000.00 for the Bank's documentation shall be due and payable by the Borrower to the Bank and shall be debited to the Account .

## 9.   Evidence of Debt

(A)   The Bank itself or through one of its branches shall maintain on its books in accordance with its usual practice an account and/or accounts in which shall be recorded (the "Account") :

(a)   the amount of the Loan and interest due in relation thereto;

(b)   any amount due or owing from the Borrower to the Bank hereunder;

(c)   any amount received or recovered by the Bank hereunder.

(B)   In any legal actions or proceedings arising out of or in connection with this Loan Agreement and/or any of the other Security Documents the entries made in the Account shall be prima facie evidence of the existence and amounts of the liabilities of the Borrower therein recorded.

## 10.  Payments

(A) (a)   All payments by the Borrower pursuant to the terms of this Loan Agreement or under the other Security Documents by the Borrower or any other Security Party whether in respect of principal, interest or otherwise howsoever shall be made to the Bank without set-off and free of any Taxes (subject to the provisions of Clause 19 hereof) or withholding or counterclaims of any nature

and without any deduction, and in clear funds which are freely transferable and convertible, in the currency (the "Currency of Account") in which the Loan or the relevant part thereof was outstanding immediately prior to such payment. In the event that the Borrower is required by law to make any such deduction or withholding from any payment then the Borrower shall forthwith pay to the Bank such additional amounts as will result in the immediate receipt by the Bank of the full amount which would have been received hereunder had no deduction or withholding been made. The Borrower shall promptly (and in any event within thirty days of the date of payment) forward to the Bank official receipts of the relevant taxation or other authority or other evidence acceptable to the Bank of the amount deducted or withheld as aforesaid. A certificate of the Bank as to any additional amounts payable to the Bank under this Clause shall, in the absence of manifest error, be conclusive evidence of the facts set forth in such certificate. The Borrower agrees to pay all taxes at the times and in the manner prescribed by law and, within forty five (45) days of any such payment, to forward to the Bank its certification of such payment together with photostatic copies of official tax receipts or other official documentation acceptable to the Bank evidencing such payment. The obligations set forth in this clause shall survive the termination of this Loan Agreement and the repayment of the Loan.

(b) The amount of the Currency of Account to be repaid or prepaid pursuant to Clause 5(A) and Clause 6(B) hereof shall equal the relevant proportion of the amount of the Loan outstanding in the Currency of Account where "relevant proportion" means the proportion which the amount in United States Dollars due to be repaid or prepaid in accordance with Clause 5(A) and Clause 6(B) bears to the USD Currency Amount.

(c) All such payments shall be made to the Bank or one of its branches via such banks in such place and account or accounts as the Bank shall notify to the Borrower and shall be effected not later than 11.00 a.m. (Cyprus time) on the date on which they ought to be made.

(B) Unless otherwise specified herein, if the day on which any payment of principal or interest is due is not a Banking Day such payment shall be due on the succeeding Banking Day unless this falls into another calendar month in which case the payment shall be made on the preceding Banking Day.

(C) Should payments have not effectively come into the free disposal of the Bank in due time the Bank will furthermore be entitled after fourteen (14) days thereof to

terminate and/or cancel this Loan Agreement and ask for immediate payment of the Outstanding Indebtedness.

## 11. Securities

To secure all its obligations under this Loan Agreement at each relevant time the Borrower shall execute and deliver and/or as the case may be shall cause to be executed and delivered to the Bank the following securities, notices and other documents all in a form satisfactory to and in favour of the Bank and shall take all corporate or other actions required by the Bank to render such securities legally binding and/or valid and/or enforceable and/or to enable the Bank at its discretion to effectively perfect its securities :

(A)   the Guarantees;

(B)   the Mortgage;

(C)   the General Assignment, together with the relevant notices thereof;

(D)   the General Hypothec; and

(E)   any other document which may be required by the Bank as security for the Loan or any part thereof or otherwise to secure and/or regulate and/or guarantee repayment of the Loan or any part thereof and/or any other amounts due to the Bank hereunder.

## 12. Insurances

(A)   The Borrower covenants and undertakes that as from the date of this Loan Agreement and throughout the Term of the Loan:

(a)   The Borrower's interest in the Vessel has to be insured with first class insurers acceptable to the Bank at least in accordance with this Clause and the relevant provisions of the Mortgage, it being understood that the Vessel shall be insured according to ITC and/or German General Rules of Marine Insurance A.D.S.

(b)   The total insured risk of the Vessel shall be for the full insurable value of the Vessel, but shall at no time be lower than 125% (one hundred twenty five per cent) of the outstanding balance of the Loan plus interest thereon, against fire,

marine and other risks (including hull and machinery and excess risks), war risks, loss of earnings risks and for the full protection and indemnity risks, including pollution risks, and the Vessel shall enter in an Association member with the International Group of P&I Clubs. The Vessel's daily earnings shall also be insured against loss of hire and/or earnings.

(c)    The Vessel does not sail to prohibited areas and/or excluded areas and/or otherwise than in conformity with the terms of the insurances (including warranties or implied therein) unless the Borrower effects or causes to be effected additional insurance sufficient to cover such risks, provided that the above additional insurance does not adversely affect and/or invalidate the terms of any insurances in place at the time.

(d)    All insurance contracts entered into in respect of the Vessel by the Borrower have to contain clauses protecting the Bank's interest as mortgagee in a form satisfactory to the Bank.

(e)    The Borrower shall renew the insurances of the Vessel prior to the expiry of the relevant policies or contracts and shall promptly and annually provide the Bank with the relevant insurance renewal certificates.

(f)    The Borrower will promptly pay all premiums, calls, contribution, or other sums payable in respect of all insurances and it will annually furnish the Bank with a confirmation of the relevant insurance companies or brokers that the insurances for the Vessel as per this Clause 12 are in full force and effect complying with the provisions hereof and of the Mortgage;

(B)    The Bank may effect a separate Mortgagee's Interest Insurance policy against marine risk and/or additional perils (pollution) in its favour for an amount not exceeding one hundred ten per centum (110%) of the outstanding balance of the Loan plus interest thereon.  By signing this Loan Agreement the Borrower agrees that the full premium and all other costs relating to the above insurance policy shall be borne by the Borrower and shall be debited to the Account and undertakes to comply with all legal conditions and rules in respect of any kind of environmental protection.

## 13.   Asset Protection

(A)    The Borrower covenants and undertakes with the Bank that, in addition to the Initial Vessel Valuation, it will from time to time upon written request by the Bank, at such

times or intervals as the Bank may reasonably request, but at least every two (2) years, cause the Vessel's market value to be valued in United States Dollars or in such other currency as the Bank may specify in its aforesaid request to the Borrower, such market value being the valuation provided by an internationally well reputed independent ship sale and purchase broker appointed by or acceptable to the Bank, each such valuation to be made, unless the Bank requests otherwise, without physical inspection and on the basis of an arms-length transaction between a willing buyer and a willing seller without taking into account any charter party or other employment of the Vessel in force at the time of any such valuation and such broker being instructed to deliver to the Bank the aforesaid valuation in writing. The first valuation of the market value of the Vessel following the Initial Vessel Valuation shall take place two (2) years after the date of this Loan Agreement. All costs arising in connection with the obtaining of any such valuation (including, but not limited to, the fees of the relevant brokers and surveyors) shall be borne by the Borrower and the Bank may debit the Account with such costs.

(B)   If at any relevant time there is a Loan to Value Shortfall, then and in such a case within a period of thirty (30) days following receipt by the Borrower of written notice from the Bank notifying to the Borrower such shortfall and specifying the amount thereof (which amount shall in the absence of manifest error be conclusive and binding upon the Borrower) either furnish the Bank with such additional security as shall be acceptable to the Bank in the Bank's sole discretion for the purpose of remedying the corresponding deficiency in security or prepay to the Bank (together with interest accrued thereon and breakage costs, if any, and any costs arising through such prepayment being made otherwise than at the end of an Interest Period) such part of the Loan as shall be necessary to ensure to the satisfaction of the Bank compliance with the provisions of this Clause 13. Any prepayments made pursuant to this Clause 13 shall be applied by the Bank in accordance with the relevant provisions of Clause 6(B). Any additional security required as a result of the operation of this Clause 13 is separate from and additional to any other security provided or to be provided under the other provisions of this Loan Agreement and the other Security Documents, but shall be deemed to be one of the Security Documents as defined herein and to have been given under the provisions of Clause 11 hereof.

**14. Representations and Warranties**

(A)   The Borrower represents and warrants to the Bank that:

(a)        <u>Due incorporation</u>

The Borrower is duly incorporated and validly existing in good standing under the laws of Malta as a limited liability company and has power to carry on its business at it is now being conducted and to own its property and other assets (including the Vessel); and to the best of the Borrower's knowledge each of the other Obligors are duly incorporated and validly existing in good standing under the laws of the Republic of Cyprus as limited liability companies and have power to carry on their respective businesses as they are now being conducted and to own their respective property and other assets;

(b)       Corporate power

The Borrower has power to execute, deliver and perform its obligations under the Security Documents to which it is or is to be a party and to borrow the Loan and to the best of the Borrower's knowledge each of the other Obligors has power to execute and deliver and perform its obligations under the Security Documents to which it is or is to be a party; all necessary corporate, shareholder and other action has been taken to authorize the execution, delivery and performance of the same and no limitation on the powers of the Borrower to borrow will be exceeded as a result of borrowing the Loan;

(c)       Binding obligations

The Security Documents constitute or will, when executed, constitute valid and legally binding obligations of the relevant Obligors enforceable in accordance with their respective terms;

(d)       No conflict with other obligations

The execution and delivery of, the performance of its obligations under, and compliance with the provisions of, the Security Documents by the relevant Obligors will not (i) contravene any existing applicable law, statute, rule or regulation or any judgment, decree or permit to which the Borrower or any other Obligor is subject, (ii) conflict with, or result in any breach of any of the terms of, or constitute a default under, any agreement or other instrument to which the Borrower or any other Obligor is a party or is subject or by which it or any of its property is bound, (iii) contravene or conflict with any provision of the memorandum and articles of association or other constitutional documents of the Borrower or any other relevant Obligor or (iv) result in the creation or imposition of or oblige the Borrower or any other Obligor to create any Encumbrance (other than a Permitted Encumbrance) on

any of the undertakings, assets, rights or revenues of the Borrower or any other Obligor;

(e)      No litigation

No litigation, arbitration or administrative proceeding is taking place, pending or, to the knowledge of the officers of the Borrower, threatened against the Borrower or any other Obligor which could have a Material Adverse Effect on the business, assets or financial condition of the Borrower or any other Obligor;

(f)      No filings required

It is not necessary in order to ensure the legality, validity, enforceability or admissibility in evidence of this Loan Agreement that it be filed, recorded or enrolled in any agency in the Republic of Cyprus, Malta or anywhere in the world;

(g)      Choice of law

The choice of Cyprus law to govern the Security Documents other than the Mortgage and of Maltese law to govern the Mortgage and the submissions thereunder by the Security Parties to the non-exclusive jurisdiction of the Cyprus courts are valid and binding.

(h)      No immunity

To the best of the Borrower's knowledge, neither the Borrower nor any other Obligor nor any of their respective assets is entitled to immunity on the grounds of sovereignty or otherwise from any legal action or proceedings (which shall include, without limitation, suit, attachment prior to judgment, execution or other enforcement);

(i)      Consents obtained

Every consent, authorization, license or approval of, or registration with or declaration to, governmental or public bodies or authorities or courts required by any Obligor to authorise, or required by any Obligor in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of each of the Security Documents or the performance by each Obligor of its obligations under the Security Documents to which it is or is to be a party has been obtained or made and is in full

force and effect and there has been no default in the observance of any of the conditions or restrictions (if any) imposed in, or in connection with, any of the same;

(j)        Pari Passu

Without prejudice to the priority afforded by the other Security Documents, the obligations of the Borrower under this Loan Agreement are direct, general and unconditional obligations of the Borrower and rank at least pari passu with all other present and future unsecured and unsubordinated indebtedness of the Borrower;

(k)        No default under other indebtedness

Neither the Borrower nor, to the best of the Borrower's knowledge, any other Obligor is (nor would with the giving of notice or lapse of time or the satisfaction of any other condition or combination thereof be) in breach of or in default under any agreement relating to Financial Indebtedness to which it is a party or by which it may be bound;

(l)        Information

The information, exhibits and reports furnished by the Borrower or, to the best of the Borrower's knowledge, by any other Obligor to the Bank in connection with the negotiation and preparation of the Security Documents are true and accurate in all material respects and not misleading, do not omit material facts and all reasonable enquiries have been made to verify the facts and statements contained therein; there are no other facts the omission of which would make any fact or statement therein misleading;

(m)        No withholding Taxes

To the best of the Borrower's knowledge no Taxes are imposed by withholding or otherwise on any payment to be made by any Obligor under the Security Documents or are imposed on or by virtue of the execution or delivery by the Obligors of the Security Documents or any other document or instrument to be executed or delivered under any of the Security Documents;

(n)        No Default

No Default has occurred and is continuing;

(o)    <u>No material adverse change</u>

There has been no material adverse change in the business or financial position of each of the Obligors from that described by the Borrower to the Bank in the negotiation of this Loan Agreement; and

(p)    <u>Copies true and complete</u>

The copies of the documents delivered or to be delivered to the Bank in relation to the amounts payable under Tranche A to Nordea Bank are, or will when delivered be, true and complete copies of such documents.

(B)   <u>Repetition of representations and warranties</u>

The representations and warranties in Clause 14(A) above shall survive the execution of this Loan Agreement and on and as of each Drawdown Date and on each Interest Payment Date the Borrower shall be deemed to repeat the representations and warranties in Clause 14(A) as if made with reference to the facts and circumstances existing on such day.

## 15. Covenants/Undertakings

(A)   The Borrower undertakes with the Bank that, from the date of this Loan Agreement and so long as any moneys are owing under any of the Security Documents and while all or any part of the Commitment remains outstanding, it will:

(a)    <u>Notice of Default</u>

Promptly inform the Bank of any occurrence of which it becomes aware which might adversely affect the ability of any Obligor to perform its obligations under any of the Security Documents and, without limiting the generality of the foregoing, will inform the Bank of any Default forthwith upon becoming aware thereof and will from time to time, if so requested by the Bank, confirm to the Bank in writing that, save as otherwise stated in such confirmation, no Default has occurred and is continuing.

(b)    <u>Consents and licenses</u>

Without prejudice to Clauses 3 and 14(A) , obtain or cause to be obtained, maintain in full force and effect and comply in all material respects with the conditions and restrictions (if any) imposed in, or in connection with, every consent, authorization,

license or approval of governmental of public bodies or authorities or courts and do, or cause to be done, all other acts and things which may from time to time be necessary or desirable under applicable law for the continued due performance of all the obligations of the Obligors under each of the Security Documents;

(c)    Use of Proceeds

Use the Loan exclusively for the purposes specified in Clause 2(B);

(d)    Pari Passu

Ensure that its obligations under this Loan Agreement shall, without prejudice to the provisions of Clause 14(A), at all times rank at least pari passu with all its other present and future unsecured and unsubordinated indebtedness with the exception of any obligations which are mandatorily preferred by law and not by contract;

(e)    Delivery of reports

Deliver to the Bank a copy of any financial report, circular, notice or like document issued by any Obligor to its shareholders or creditors generally as the Bank may reasonably require;

(f)    Provision of further information

(i)    Provide the Bank with such financial and other information concerning the Borrower, the other Obligors and their respective affairs as the Bank may from time to time reasonably require and it will regularly provide the Bank (a) with its signed audited financial statements, not later than on 31 May after the close of its business year (b) with its interim management reports (incorporating information such as days of operation of the Vessel, operating expenses and daily time charter rates in respect of the Vessel) within two (2) months following the end of each calendar quarter ending on 31 March, 30 June, 30 September and 31 December starting from the date hereof up to the end of the Term of the Loan, (c) with its audited accounts until 30 April of every year starting from the date hereof up to the end of the Term of the Loan and (d) with a monthly report of the Pool Employment (as defined in (ii) below) on a monthly basis;

(ii)    Provide the Bank within ten (10) days after drawdown of Tranche A with a copy of any charterparty agreement in respect of the Vessel or a confirmation (such confirmation to be in form and substance acceptable to the Bank) of any pool employment of the Vessel acceptable to the Bank in force as at that time (the "Pool Employment") which shall not change without the Bank's prior consent and, in case the Vessel at any time ceases to form part of the Pool Employment, it will immediately inform the Bank and upon the Bank's first written demand, it will provide the Bank with a copy of any charterparty agreement in respect of the Vessel or a confirmation (such confirmation to be in form and substance acceptable to the Bank) of any other employment of the Vessel acceptable to the Bank or if not demanded by the Bank as above or at any time after such demand, it will provide the Bank with a copy of any charterparty agreement in respect of the Vessel or a confirmation (such confirmation to be in form and substance acceptable to the Bank) of any such other employment of the Vessel within ten (10) days after the entry into such or other charterparty agreement or such other employment of the Vessel acceptable to the Bank;

(g)    <u>Obligations under Security Documents</u>

(i)    Duly and punctually perform each of the obligations expressed to be assumed by it under the Security Documents;

(ii)    Do all acts and things within its powers so that the rights and powers of the Bank under the Security Documents (whether the Borrower is a party thereto or not) shall be fully and effectively preserved and executed; and

(iii)    Not enter into, condone or authorise any transactions or acts in contravention of the undertakings or obligations to the Bank contained in any of the Security Documents (whether the Borrower is a party thereto or not).

(h)    <u>Vessel Earnings</u>

The charter hire and all other earnings of the Vessel from whatever source will be made payable and paid into an account current held with the Bank or to current account (the "Operating Account") or any other account(s) notified by the Bank pursuant to the terms of Clause 10(A)(c) hereof.

(B)   The Borrower further covenants that:-

(a)   It shall procure that the Vessel shall on the date of this Loan Agreement be registered in the ownership of the Borrower and thereafter procure that the Vessel remains permanently registered as a Maltese flag ship (unless the prior written consent of the Bank is obtained for changing the flag of the Vessel and then subject to such terms as the Bank may impose ) and to do or suffer to be done nothing whereby such registration may be forfeited or imperilled;

(b)   It shall promptly, and in any case prior to any penalties arise, pay any and all stamp duties and other transaction taxes or registration charges imposed by governmental, local or other authorities in the Republic of Cyprus and/or Malta;

(c)   as from the date of this Loan Agreement and so long as any moneys are owing under any of the Security Documents and while all or any part of the Commitment remains outstanding, it shall not without the prior written consent of the Bank (which shall not be unreasonably withheld):

(i)   sell, transfer, assign or otherwise dispose of the Vessel in any way, or

(ii)   pay any dividends to its shareholders or interest to silent partners if any Repayment Instalment or interest accrued are overdue and the operating costs of the Vessel and the payment of further Repayment Instalments and interest are not covered by earnings of the Borrower for the next six (6) months;

(iii)   create, assume or permit to exist any mortgage, lien, pledge, charge, encumbrance or any security interest whatsoever upon the Vessel or its Earnings, Insurances or Requisition Compensation (as the terms are to be defined in the Mortgage), other than a Permitted Lien; or

(iv)   save pursuant to the Pool Employment, agree to bareboat charter and/or hire the Vessel for more than twelve (12) months;

(v)   change or approve any change of the management of the Vessel;

(d)   as from the date of this Loan Agreement and so long as any moneys are owing under any of the Security Documents and while all or any part of the Commitment remains outstanding, it shall:

(i)    at its own expense, maintain the Vessel in a seaworthy condition and in good running order;

(ii)   have the Vessel classed and maintained classified by the Classification Society without remarks or recommendations and upon the Bank's request to provide the Bank with a certificate issued by the Classification Society confirming that classification is maintained;

(iii)  comply, or procure that the operator of the Vessel will comply, with – as applicable – all requirements of the International Convention for the Safety of Life at Sea (SOLAS) 1974 as adopted, amended or replaced from time to time including, but not limited to, the STCW95, the ISM Code and/or the ISPS Code (as each is defined in the respective amendments to SOLAS);

(iv)   comply, or procure that any manager of the Vessel will comply, with the International Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organization (as the same may be amended from time to time, the "ISM Code") or any replacement of the ISM Code and in particular, without prejudice to the generality of the foregoing, as and when required to do so by the ISM Code and at all times thereafter: (a) hold, or procure that any manager of the Vessel holds a valid Document of Compliance duly issued to the Borrower or the said manager (as the case may be) pursuant to the ISM Code and a valid Safety Management Certificate duly issued to the Vessel pursuant to the ISM Code, (b) provide the Bank with copies of any such Document of Compliance and Safety Management Certificate as soon as the same are issued, and (c ) keep, or procure that there is kept, on board the Vessel a copy of any such Document of Compliance and the original of any Safety Management Certificate;

(v)    notify the Bank: (a) of any actual withdrawal of the Safety Management Certificate and/or the Document of Compliance; and (b) of any "accident" or "major non-conformity", as each of those terms is defined in the Guidelines on the implementation of the International Safety Management Code by Administrations ( as adopted by the Assembly of the International Maritime Organization) which may materially affect the interests of the Bank under the Mortgage and/or the General Assignment, and of the steps being taken to remedy the situation and of

the estimated implications and/ or adverse results that may have on the use and/ or performance of the Vessel's activities;

(e) Upon request of the Bank it shall procure that the Bank is provided with any information in relation to the costing of the changes and/ or refurbishments of the machinery and hull of the Vessel and will deliver any copies of such certificates that may be issued in relation to such refurbishments.

(f) It will not, without the prior written consent of the Bank, permit any Encumbrance (other than a Permitted Encumbrance) to subsist, arise or be created or extended over all or any part of its present or future undertakings, assets, rights or revenues to secure or prefer any present or future Financial Indebtedness or other liability or obligation of the Borrower or any other Obligor.

(g) it will not, without the prior written consent of the Bank, enter into any amalgamation or corporate reconstruction or merge or consolidate with any other person.

(h) It will not, without the prior written consent of the Bank (which shall not be unreasonably withheld), sell, transfer, abandon, lend or otherwise dispose of or cease to exercise direct control over any part (whose value at the time of the sale, transfer, abandonment, loan or disposal either alone or when aggregated with all other disposals falling to be taken into account pursuant to this clause 15(B)(h) exceeds 5% of the hull insured value of the Vessel) of its present or future undertaking, assets, rights or revenues (otherwise than by transfers, sales or disposals for full consideration in the ordinary course of trading) whether by one or a series of transactions related or not;

(i) It will not, without the prior written consent of the Bank, undertake any business other than the ownership and operation of the Vessel and the chartering of the Vessel to third parties.

(j) It will not, without the prior written consent of the Bank, acquire any further assets other than the Vessel, rights arising under contracts entered into by or on behalf of the Borrower in the ordinary course of its business of owning, operating and chartering the Vessel and assets whose value at the time of acquisition exceeds 5% of the hull insured value of the Vessel.

(k) It will not, without the prior written consent of the Bank, incur any obligations except for obligations arising under the Security Documents and the

Borrower's Guarantee or contracts entered into in the ordinary course of its business of owning, operating and chartering the Vessel.

(l) It will not, without the prior written consent of the Bank, incur any Borrowed Money except for Borrowed Money pursuant to the Security Documents.

(m) It will not, without the prior written consent of the Bank, issue any guarantees or indemnities or otherwise become directly or contingently liable for the obligations of any person, firm, or corporation except pursuant to the Security Documents and except for guarantees or indemnities from time to time required in the ordinary course of business by any protection and indemnity or war risks association with which the Vessel is entered, guarantees required to procure the release of the Vessel from arrest, detention, attachment or levy or guarantees or undertakings required for the salvage of the Vessel.

(n) It will not, without the prior written consent of the Bank, make any loans or grant any credit (save for normal trade credit in the ordinary course of business) to any person or agree to do so.

(o) Unless otherwise provided for in this Loan Agreement, it will not, without the prior written consent of the Bank, purchase or otherwise acquire for value any shares of its capital or distribute any of its present or future assets, undertakings, rights or revenues to any of its shareholders.

(p) It will not, without the prior written consent of the Bank, form or acquire any subsidiary.

(q) It will procure that the Initial Vessel Valuation will be delivered to the Bank at least three (3) Banking Days prior to Drawdown Date A.

(r) It will procure that Interorient is and during the Term of the Loan shall remain the sole direct shareholder of each of the Borrower and Orient Tribune.

(s) It will provide the Bank, and/or (as the case may be) will procure that the Bank is provided with, evidence relating to the total costs of the next (following the date of this Loan Agreement) two dry-dockings of each of the Vessel and the Orient Tribune Vessel and in case such dry-docking costs exceed the forecasted costs of USD600,000.00  per dry-dock in respect of each of the Vessel and the Orient Tribune Vessel, the relevant shortfall will be covered by Interorient within a month's period after the costs are incurred.

(t)     It will regularly during the Term of the Loan provide the Bank with (i) updated lists of recent scrapings and corresponding prices issued from the most widely and reputable database provided by Clarksons Researchs Ltd and (ii) copies of all class status reports of the Vessel.

(u)     It will and/or (as the case may be) will procure that, in case after the lapse of two years from the date of this Loan Agreement the performance of the Vessel and the Orient Tribune Vessel is not in line with the projections provided to the Bank prior to the entry into this Loan Agreement and any past due amounts in relation to the Loan and/or the Orient Tribune Loan exist, the Vessel and/or the Orient Tribune Vessel and/or any other vessel of the fleet of vessels belonging to Interorient will be sold and the proceeds of such sale will be utilized towards reduction of (at the Bank's discretion and in such order as the Bank may deem fit) the Loan and/or the Orient Tribune Loan and/or the Interorient Loan and/or the Interorient Overdraft.

## 16.  Legal Opinions

The Bank's Cyprus and Maltese lawyers shall give respective legal opinions confirming inter alia that

(A)     the Borrower is a company duly incorporated, validly existing an in good standing under the laws of Malta and each of the other Obligors is a company duly incorporated, validly existing and in good standing under the laws of the Republic of Cyprus,

(B)     this Loan Agreement has been validly signed on behalf of the Borrower and represents a valid and binding obligation of the Borrower enforceable in accordance with its terms,

(C)     all Security Documents have been validly signed by the relevant Obligors and represent valid and binding obligations of such Obligors enforceable against them in accordance with their respective terms,

(D)     the legality, validity, enforceability and admissibility in evidence of the Security Documents under the laws of the Republic of Cyprus and the laws of Malta are not subject to or conditional upon the Security Documents (other than payment of any Cyprus stamp duty and the registration of the Mortgage in the Maltese Ships Register and the registration of the General Hypothec at the

Public Registry in Malta, all of which shall have been duly effected) being filed, recorded or enrolled with any governmental authority or agency,

(E)    under the laws of Malta the Borrower may validly and effectively have the Vessel registered in its ownership under the laws and flag of Malta,

(F)    the Mortgage has been duly registered in the Malta Ships Register and constitutes a valid first priority mortgage on the Vessel pursuant to the laws of Malta,

(G)    in so far as present Cyprus and Maltese laws are concerned all approvals, consents and permissions of the Republic of Cyprus and/or Malta (if any) required for the execution and delivery of this Loan Agreement and in particular those pertaining to the granting and registration of the Mortgage, the Borrower, the repayment of the Loan and the payment of interest and other amounts payable hereunder in the United States Dollar or any other currency in which the Loan or any part thereof may be funded pursuant to Clause 4(A) and (B) have been given by the relevant authorities and that such approvals, consents and permissions are still in force. All exchange and transfer permits (if any) necessary in the Republic of Cyprus and/or Malta for the execution and delivery of this Loan Agreement have been obtained.

## 17.   Costs, Expenses and Fees

The Borrower shall indemnify the Bank upon demand for any legal or other costs or expenses incurred by it in connection with the preparation, conclusion and performance of this Loan Agreement, irrespective of whether the Loan or any Tranche or any part thereof has been disbursed or not. The Bank may debit the Account with any such costs or expenses. Such costs shall include in particular those incurred in connection with

(a)    any and all stamp duties and other transaction taxes or registration charges imposed by governmental, local or other authorities in the Republic of Cyprus and/or Malta;  the Borrower shall indemnify the Bank against any and all liabilities in respect of or resulting from delay or omission on the part of the Obligors to pay such taxes or charges which may be payable or determined to be payable in connection with the Loan Agreement and the other Security Documents

(b)    the registration, maintenance and administration of the Mortgage,

(c)     the insurance, the safekeeping and the maintenance of the Vessel,

(d)     the lifting of a possible embargo on the Vessel,

(e)     the enforcement of any claims against the Borrower and/or any of the other Obligors and/or any other guarantors or any charterer or insurer of the Vessel,

(f)     the preservation of the Bank's rights under this Loan Agreement or any of the other Security Documents, and

(g)     all costs and expenses reasonably incurred by the Bank by way of fees, charges or expenses of valuers, surveyors, shipbrokers, auditors, lawyers or other experts under or in relation to the Loan Agreement and the other Security Documents.

## 18.   Change in applicable Law/Circumstances – Increased costs

(A)     Notwithstanding anything to the contrary herein contained, in the event that any change in any applicable law, regulations or regulatory requirements or in the interpretation thereof shall make it unlawful or any other circumstances shall make it impossible for the Bank to maintain or give effect to its obligations under this Loan Agreement, the Bank shall be entitled to cancel and/or terminate this Loan Agreement partially or totally. The Bank will, however, negotiate with the Borrower in good faith to agree on new conditions. Should it not be possible to agree on new conditions within thirty (30) days from the beginning of such negotiations the Bank shall be entitled to demand immediate repayment by the Borrower of the Outstanding Indebtedness immediately upon first written demand of the Bank.

(B)     If any material change in applicable law, regulations or regulatory requirements or in the interpretation or if compliance by the Bank with any applicable direction, request or requirement (whether or not having the force of law) of any competent governmental or other authority including, without limitation to the generality of the foregoing, the Basel Rules, or the interpretation thereof by any authority charged with the administration thereof, shall:

(a)     subject the Bank to any additional Taxes of any nature in respect of the granting and/or continuing the granting and/or funding and/or refinancing of the Loan; or

(b)     change the basis of taxation of the Bank for payments of principal, interest or any other payment due or to become due to it pursuant to this Loan Agreement (other than a change in the basis of taxation on the overall net income of the Bank); or

(c)     impose, modify or deem applicable any reserve requirements and/or require the making of any special deposits, against or in respect of any assets or liabilities of, deposits with or for the account of, or loans by the Bank; or

(d)     impose on the Bank any other conditions affecting this Loan Agreement or the Loan or its funding; or

(e)     impose on the Bank an obligation to comply with any request, law, regulation or directive from any competent fiscal or monetary authority (whether or not having the force of law) including (without limitation) the Basel Rules imposed on the Bank,

and the result of any of the foregoing is, either directly or indirectly, (i) to increase the costs of the Bank in making, funding or maintaining advances under this Loan Agreement or (ii) to reduce the amount(s) of principal, interest or any other amount receivable by the Bank hereunder or (iii) the Bank makes any payment or foregoes any interest or other return on or calculated by reference to the gross amount of any sum receivable by the Bank from the Borrower hereunder,

then and in each such case upon demand from time to time the Borrower shall pay to the Bank such amounts as shall compensate it for such increased costs, reduction, payment or foregone interest or other return. If the Bank makes a claim pursuant to this Clause 18(B), it shall notify the Borrower of the event by reason of which the Bank is so entitled. The Bank shall submit to the Borrower a letter setting out details of the event giving rise to such compensation, the amount thereof and the manner in which it has been calculated and, in the absence of manifest error, such a letter shall be conclusive and binding on the Borrower.

In such case however the Borrower shall be entitled to prepay the outstanding balance of the Loan together with accrued interest and costs and other amounts payable hereunder on giving the Bank not less than thirty (30) days prior written notice in accordance with Clause 6(B).

(C)    If any amount payable by the Borrower hereunder whether in respect of principal, interest or otherwise is or becomes at any time subject to taxation in the Republic of Cyprus and/or Malta or elsewhere , the Borrower will indemnify the Bank for such amount in respect of such tax liability so that the Bank receives or retains a net sum equal to the amount it would have received or retained had there been no such tax liability, but if the Bank shall be or becomes entitled to any tax credit or relief in respect of any such tax liability or deduction and if the Bank in its sole determination actually receives a benefit from such tax credit or relief in the Republic of Cyprus and/or Malta or elsewhere, the Bank shall, subject to any laws or regulations applicable to it, pay to the Borrower after such benefit is effectively received by the Bank such amount (which shall be conclusively certified by the Bank) as shall ensure that the net amount actually retained by the Bank is equal to the amount which would have been retained if there had been no such liability or deduction.  In addition the Borrower shall indemnify the Bank in respect of any sum payable by the Borrower under this Loan Agreement against any liability for Taxes in the Republic of Cyprus and/or Malta or elsewhere imposed on the Bank by virtue of the negotiation, preparation or execution of this Loan Agreement, and/or the other Security Documents, the performance of any duty or discharge of any liability hereunder and/or under the other Security Documents or the receipt of any payment hereunder and/or under the other Security Documents.

## 19.    Conversion and Extraordinary Repayment

If for the purpose of obtaining judgement in any court within or outside the Republic of Cyprus it becomes necessary to convert any amount from United States Dollars or any other currency in which the Loan or any part thereof is disbursed to the Borrower and is due hereunder in another currency, then such conversion shall be made at the Spot rate of exchange before the action is brought in court, i.e. two business days before the action is brought in court.

In the event that there is a change in the rate of exchange prevailing between the above date and the date of the payment due, the Borrower will pay such additional

amounts, if any, as may be necessary to ensure that the amount paid on such date is equivalent to the amount then due under this Loan Agreement as a separate debt.

If serious disturbances of a political, military, economic or financial nature or other events occur, which in the view of the Bank might prejudice its rights under the Mortgage registered in Malta, the Bank may demand that the Borrower negotiates with it on a transfer of the Vessel's registration. Should an agreement thereon not be reached within four (4) weeks of the Bank's demand, then the Bank may require the immediate transfer of the Vessel's registration to another country of its choice and the completion of all steps necessary to this end including, where need be, the transfer of the Vessel's ownership to an owner resident or a company registered in such country and the entry of the Mortgage or a first priority mortgage on the Vessel corresponding to the amount of the Outstanding Indebtedness at the time in the new register. Should such demand not be met or the circumstances be such as to make in the view of the Bank a regular continuation of this Loan Agreement impossible or seriously endanger such a continuation, the Bank may require by telefax advice the immediate discharge from all liabilities under this Loan Agreement and the immediate repayment of the Outstanding Indebtedness.

20. **Events of Default**

(A) The Bank may, by notice to the Borrower and without prejudice to any other rights of the Bank under the Security Documents and without the necessity of any declaration of any court of law in any jurisdiction to the effect that an Event of Default has occurred, declare the Outstanding Indebtedness to be immediately due and payable, whereupon the Borrower shall be obliged forthwith to pay the Outstanding Indebtedness to the Bank and any security held pursuant to the terms hereof and all rights, powers and remedies under the Security Documents shall become immediately enforceable and exercisable at the Bank's sole discretion, if any of the following events has occurred and is continuing:

(a) the Borrower has failed to pay any sum in respect of the principal of or interest on the Loan or any part thereof or any other amount whatsoever due hereunder or under the other Security Documents in the manner provided herein or therein and within fourteen (14) calendar days of the due date thereof or, in the case of sums payable on demand, in accordance with such demand;

(b) the Borrower or any of the other Obligors makes default in or omits to observe the due and prompt performance and/or observance and/or fulfilment of any

term or condition of or the covenants or undertakings or obligations on its part to be observed and performed under any of the Security Documents (not being a default which falls under paragraph (a) above) which default is not, in the opinion of the Bank, capable of remedy, or if the same is in the opinion of the Bank capable of remedy, such default is not remedied within fourteen (14) calendar days after written notice from the Bank requesting remedial action;

(c)    any of the representations and warranties made by the Borrower or any of the other Obligors in any one of the Security Documents or in connection herewith or therewith or any notice, certificate or statement delivered or made pursuant hereto or thereto is or becomes, if repeated by reference to facts and circumstances then subsisting, materially, in the opinion of the Bank, incorrect or inaccurate or misleading;

(d)    any loan, debt, guarantee or other obligation constituting Financial Indebtedness of any of the Obligors becomes or is declared due prior to its specified maturity date by reason of default or a distress or other execution or any creditor of any of the Obligors becomes entitled to declare any such Financial Indebtedness due and payable or any facility or commitment available to any of the Obligors relating to the Financial Indebtedness, is withdrawn, suspended or cancelled by reason of any default of the person concerned unless the relevant Obligor shall have satisfied the Bank that such withdrawal, suspension or cancellation will not affect or prejudice in any way the relevant Obligor's ability to pay its debts as they fall due and fund its commitments, or any guarantee given by any such Obligor in respect of Financial Indebtedness is not honoured when due and called upon;

(e)    save for, or in relation to, any claims or other action on or against the Vessel or the Borrower as owner of the Vessel which are covered by any of the insurances of the Vessel which are (inter alia) the subject matter of the General Assignment, any injunction is levied or ordered upon or against any part of the property of any of the Obligors or any judgment is made against any of the Obligors and is not stayed or complied with within fourteen (14) calendar days or a creditor attaches or takes possession of, or a distress, execution, sequestration or other process is levied or enforced upon or sued out against, any of the undertakings, assets, rights or revenues of any Obligor and is not discharged within fourteen (14) calendar days;

(f)    any of the Borrower or the other Obligors stops or supersedes payment of or is unable to or admits in writing its inability to pay its debts as they mature or is

generally not paying its debts as they become due or makes a general assignment for the benefit of its creditors or any special arrangement or composition with its creditors;

(g)     any resolution is passed, or a meeting is convened, or any proceedings are commenced for the purpose of, or any order or judgment is made or given by any court of competent jurisdiction for the liquidation, bankruptcy, winding-up or reorganisation of any of the Borrower or the other Obligors (otherwise than for reconstruction while solvent on terms previously approved by the Bank) or for the appointment of a receiver, administrator, trustee, conservator or liquidator of all or a substantial part of its undertaking or assets;

(h)     a meeting is convened by any of the Borrower or the Guarantors for the purpose of passing any resolution to purchase, reduce or redeem any of its share capital which in the opinion of the Bank will adversely affect the ability of the Borrower and/or any of the Guarantors to meet their respective obligations under the Security Documents;

(i)     there occurs, in relation to any of the Obligors, in any country or territory in which any of them carries on business or to the jurisdiction of whose courts any part of their assets is subject, any event which, in the reasonable opinion of the Bank, appears in that country or territory to correspond with, or have an effect equivalent or similar to, any of those mentioned in Clause 20 (A) (e)-(g) (both inclusive) or any Obligor otherwise becomes subject, in any country or territory, to the operation of any law relating to insolvency, bankruptcy or liquidation;

(j)     any licence, consent, permission or approval required at any time during the subsistence of the Security Documents in connection with the implementation, maintenance and performance of any one of the Security Documents is revoked, terminated, modified or imposed and it consequently becomes impossible or unlawful for:

(i)     any one of the Borrower or the other Obligors to fulfil any of its covenants and obligations contained in any one of the Security Documents, or

(ii)     the Bank to exercise its rights under any one of the Security Documents;

(k)     the Vessel is sold or changes its country of registration or flag otherwise than with the consent of the Bank which shall not be unreasonably withheld or delayed;

(l)     by or under the authority of any government, court or other public authority the *management of any of the Security Parties or of the Vessel is wholly or partially* displaced in a way that may adversely affect the ability of the Borrower to meet its payment obligations under this Loan Agreement or the authority of the Borrower in the conduct of its business is wholly or partially curtailed;

(m)    the Vessel is or becomes a Total Loss and the insurance proceeds in respect thereof or alternative security satisfactory to the Bank has not been received by the Bank within thirty (30) days of the casualty or event giving rise to such Total Loss;

(n)    any of the Insurances on the Vessel are cancelled due to non-payment of premium or the Vessel otherwise ceases to be insured in accordance with the provisions of this Loan Agreement;

(o)    the Vessel is subjected to any mortgage (other than the Mortgage), lien (other than *a Permitted Encumbrance) or other encumbrance without the Bank's* prior written consent;

(p)    for any reason whatsoever, the Vessel ceases to be managed and operated on terms reasonably satisfactory to the  Bank or by the Borrower in a way that may adversely affect the ability of the Borrower to meet its payment obligations under this Loan Agreement;

(q)    the Loan or any part thereof has not been utilised for its intended purpose;

(r)    for any reason whatsoever there is any change in the ultimate legal and beneficial shareholding of the Borrower or the other Obligors from that existing and disclosed to the Bank on the date of this Loan Agreement without the Bank's prior written consent which shall not be unreasonably withheld or delayed;

(s)    any of the Security Documents ceases to be in full force and effect;

(t)    the validity and/or enforceability of this Loan Agreement and/or any of the other Security Documents may, pursuant to a legal opinion given to the Bank

by any of its lawyers, be subject to material doubt and the Borrower fails to comply within fourteen (14) days from receipt of the Bank's written demand to remedy such material doubt to the Bank's satisfaction;

(u)     an Event of Default (as therein defined) or any breach or event of default howsoever defined or described (or any event which with the giving of notice or lapse of time or any other applicable condition or any combination of the foregoing would constitute such an event of default) under any one of the other Security Documents shall occur;

(v)     any Obligor suspends or ceases or threatens to suspend or cease to carry on its or their business;

(w)     all or a material part of the undertaking, assets, rights or revenues of, or shares or other ownership interests in, any Obligor are seized, nationalized, expropriated or compulsorily acquired by or under the authority of any government;

(x)     any Encumbrance (other than a Permitted Encumbrance) in respect of any of the property or part thereof, which is the subject of any of the Security Documents becomes enforceable;

(y)     there occurs, in the reasonable opinion of the Bank, a material adverse change in the financial condition of any of the Obligors which is capable of adversely affecting the rights of the Bank under the Security Documents;

(z)     any other event occurs or circumstance arises which in the reasonable opinion of the Bank, is likely to affect either (i) the ability of any of the Obligors to perform all or any of its obligations under or otherwise to comply with the terms of any Security Document or (ii) the security created by any of the Security Documents.

(B)     In case of any Event of Default the Bank shall be under no further obligation to advance monies hereunder.

(C)     In the event of default in any payment due hereunder, the Borrower shall reimburse the Bank with its reasonable costs of collection including all legal fees and interest due to the date of actual payment and shall indemnify the Bank against all losses or expenses that the Bank may suffer, incur or sustain as a result of such default including any costs suffered by the Bank as a result of the failure of the Borrower to

*pay any sum due hereunder on the due date for payment as conclusively certified by* the Bank pursuant to the terms and conditions of this Loan Agreement and the other Security Documents.

## 21. General Lien

It is understood that during the entire period of dealings of the Borrower with the Bank under or in connection with this Loan Agreement and up until the full and final payment of the Outstanding Indebtedness, the Bank shall have, as further security or guarantee for any monies and obligations owed today or to be owed in the future during the subsistence of this Loan Agreement by the Borrower to the Bank or to any branch thereof under or in connection herewith and in any form (whether personally or jointly with any other person and under any other name or trade name and whether such obligations have become or may become due or are direct or indirect) a general preferential lien on the total or any amount of money, on any negotiable instrument and on any kind of assets which are the property of the Borrower, and which may come into the possession, custody or control of the Bank or any of the branches thereof.

## 22. Combination and consolidation of accounts

The Bank is entitled at any moment without giving notice to the Borrower, to combine or consolidate all or any of the Borrower's accounts against or in full settlement of the Borrower's obligations towards the Bank under or in connection with this Loan Agreement and to set-off or transfer any amount(s) which may stand to the Borrower's *credit in account(s) held with the Bank towards settlement of any part of* the Borrower's obligations to the Bank under or in connection with this Loan Agreement of any nature whatsoever under any account or arising from any reason whatsoever, whether such obligations have become or may become due in the future during the subsistence of this Loan Agreement and whether such obligations are direct or indirect, personal or jointly owed with any other person(s). Moreover, the Borrower hereby irrevocably authorizes the Bank to transfer and deposit against or in settlement of the Loan, any amount which the Borrower may have in account(s) with the Bank, and the Borrower hereby irrevocably authorizes the Bank to proceed with any such transfer. It is understood that in effecting such set off, combination, consolidation or transfer, the Bank will be entitled to convert, where necessary, any amounts standing to the credit of the Borrower into a different currency, using the **Spot** rate of exchange with reference to the date of such set off, combination, consolidation or transfer.

23. **Transfer**

(A)   This Loan Agreement shall be binding upon and inure to the benefit of each party hereto and its successors and permitted assigns.

(B)   The Borrower may not assign or transfer any or all of its rights, benefits or obligations under this Loan Agreement or under any of the other Security Documents without the Bank's prior written consent, such consent not to be unreasonably withheld or delayed.

(C)   Subject to the provisions of paragraph (D) below, the Bank may assign or transfer any of its rights, benefits or obligations under this Loan Agreement and under any other Security Document (i) to any Related Company, or (ii) with the Borrower's notice to any other reputable bank or financial institution (the "New Lender"), provided that the Borrower shall not be bound by any such assignment or transfer until it has received written notice of the same from the Bank. All agreements, representations and warranties made herein shall survive any transfer made pursuant to this clause.

(D)   Subject to the conditions set out above in this Clause 23 a transfer is effected if the New Lender, by delivery of such undertaking as the Bank may approve, becomes bound by the terms of this Loan Agreement and agrees to perform all or, as the case may be, part of the Bank's obligations under this Loan Agreement.

(E)   Subject and pursuant to the foregoing provisions of this Clause 23, the Bank may disclose (without prejudice to any other right, liberty or discretion it may have under any applicable law) to any person:

(a)   to or through whom it assigns or transfers or may potentially assign or transfer all or any of its rights, interests, benefits or obligations under all or any of the Security Documents;

(b)   with or through whom it enters or may potentially enter into any participation, sub-participation or other arrangement for or in relation to any payments which are or may be made in relation to this Loan Agreement or any other Security Documents or the Borrower;

(c) from or through whom it requires or seeks any report, valuation, determination, computation, assessment, opinion, advice or information to which it is entitled in relation to any Security Document or any Security Party,

such information about the Borrower, its business, assets or financial condition or any other Security Party and any of the Security Documents as the Bank may consider appropriate, subject to the prior written consent of the Borrower if such disclosure is not to be made to a Related Company.

(F) If the Bank assigns and/or transfers all or any part of its rights, benefits and/or obligations as provided above in this Clause 23, the Borrower undertakes, immediately on being requested to do so by the Bank and at the cost of the Bank, to enter into, such documents as may be necessary or desirable to assign and/or transfer to the New Lender all or any relevant part of the Bank's interests in the Security Documents and all relevant references in this Loan Agreement and/or the other Security Documents to the Bank shall thereafter be construed as reference to the Bank and/or the New Lender to the extent of their respective interests.

(G) The Bank may at any time and from time to time change its lending office and/or delegate any one or more of its rights, powers and/or obligations under this Loan Agreement and/or the other Security Documents to any person being duly authorised to act in connection with the Loan Agreement and/or the other Security Documents on behalf of the Bank or any Related Company or any New Lender.

(H) The Borrower undertakes to do or to procure all such acts and things and to sign, execute and deliver or procure the signing, execution and delivery of all such instruments and documents as the Bank may require for the purpose of perfecting any such assignment, transfer, sub-participation, change or delegation as aforesaid.

24.    **Indemnity**

The Borrower shall indemnify the Bank against any loss (other than loss of profit), liability or expense which it may sustain or incur (in good faith and using reasonable endeavours to minimise such loss or expense) as a consequence of (i) any default in payment of the principal amount of the Loan or any part thereof or interest accrued thereon or any other amount due hereunder, (ii) the occurrence of any Event of Default hereunder, (iii) the Loan not being drawn down hereunder as

provided for in Clause 3 hereinabove, (iv) any prepayment of the Loan under Clause 6 or Clause 18 hereinabove and (v) any payment being made otherwise than on the Repayment Date or an Interest Payment Date. Without prejudice to its generality, the foregoing indemnity shall extend to such loss or expense sustained or incurred on account of funds acquired, contracted for or utilised to fund or maintain the Loan (or any part thereof) or any other amount due or to become due under this Loan Agreement.

25. **Applicable Law and Jurisdiction**

All rights and obligations arising from or in connection with this Loan Agreement shall be governed by and interpreted according to the laws of the Republic of Cyprus.

The parties agree that any legal action or proceedings arising out or in connection with this Loan Agreement shall be brought in the Courts of the Republic of Cyprus and the Borrower hereby irrevocably submits to the non-exclusive jurisdiction of such courts and agrees that any writ, judgement or other notice of legal process shall be sufficiently served on it if delivered with regard to proceedings in the Courts of Cyprus to Interorient Navigation Company Limited, at 142 Franklin Roosevelt, 3011 Limassol, Cyprus whom the Borrower hereby appoints as its process agent in Cyprus. However, the Bank expressively reserves the right to claim its rights under this Loan Agreement against the Borrower at any place where this is legally permitted or at the place of the Borrower's registered office or any of the Borrower's branches or at any place where the Vessel is located.

26. **Language**

Any certificates, instruments, notices and other documents to be delivered under this Loan Agreement shall be either in the English or the Greek language. Should this not be possible then any of the aforesaid documents shall be accompanied by a certified translation into either English or Greek language.

27. **Miscellaneous**

(A)   Time is of the essence of this Loan Agreement but no failure or delay on the part of the Bank to exercise any power or right under this Loan Agreement or any of the Security Documents shall operate as a waiver thereof, nor shall any single or partial exercise by the Bank of any power or right under this Loan Agreement or under any of the other Security Documents preclude any other or further exercise

thereof or the exercise of any other right. The remedies provided herein and in the other Security Documents are cumulative and are not exclusive of any remedies provided by law.

(B) In case any one or more of the provisions contained in this Loan Agreement or in the other Security Documents should be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions contained herein or in the other Security Documents shall not in any way be affected or impaired thereby. Terms and conditions which are invalid, illegal or unenforceable shall be replaced, and circumstances not covered shall be covered, by appropriate provisions and arrangements in conformity with the spirit and purpose of this Loan Agreement.

(C) No provision hereof may be amended, waived, discharged or terminated orally, but only by an instrument in writing signed by both parties hereto.

(D) Nothing in this Loan Agreement shall preclude the right of the Bank to apply any sum owed to the Borrower by the Bank in or towards satisfaction of any sum due to it from the Borrower hereunder. The Bank shall not be obliged to make any such application as is referred to in this Clause but, if it does, it shall give prompt notice thereof to the Borrower. If such application results in the full or partial satisfaction of the sums due by the Borrower, the Borrower's obligations shall be deemed to be satisfied to the extent of such application.

(E) Whenever pursuant to this Loan Agreement or the other Security Documents interest is or may be charged in favour of, or is payable to, the Bank on costs, fees, expenses or any other amounts (other than interest on the Loan) such interest shall be calculated at the highest rate provided in Clause 7(H) hereto.

(F) Notwithstanding the obligation of the Borrower and any other Security Party to procure the preparation and submission to the Bank of any valuations, reports, calculations, statements, opinions or other documents from valuers, surveyors, shipbrokers, auditors, lawyers or other experts as provided in any of the Security Documents, the Bank shall be entitled, whenever it so determines, to require the preparation of any such valuations, reports or other documents as aforesaid by experts of the Bank's choice and the Borrower shall ensure that every facility is extended to any such experts and all required documents, information or other material are made available to it.

## 28. Address

(A)     Any notice, demand, request, claim or other communications required or permitted hereunder shall be given in writing by registered mail or by facsimile or delivered by hand or a private delivery service.

(B)     Every such notice, demand, request, claim or other communications shall, except so far as is otherwise expressly provided by this Loan Agreement, be deemed to have been received:

(a) if sent by registered mail, three business days after the same being properly addressed, stamped and posted;

(b) if sent by facsimile, when the sender receives the print-out report of its facsimile machine indicating that the transmission was duly completed;

(c) if delivered by hand or a private delivery service, upon delivery to the addressee;

provided that if receipt of any such notice, demand, request, claim or other communications does not occur during normal business hours on a Banking Day, such notice, demand, request, claim or other communications shall not be deemed to have been received until the following Banking Day.

(C)     Any notice, demand, request, claim or other communications required or permitted hereunder shall be deemed to have been sufficiently given if addressed as follows:

(i)     If to the Borrower,
Orient Alliance Shipping Company Limited
c/o Interorient Navigation Company Limited
142 Franklin Roosevelt
3011 Limassol/Cyprus
(Telefax No. +357 25575895)

(ii)    If to the Bank,
**HELLENIC BANK PUBLIC COMPANY LIMITED**
At 131 Arch. Makarios Avenue,
2nd Floor, 3508 Limassol, Cyprus
Fax: + 357 25502478

or to such other address or facsimile, as the parties hereto may hereafter notify in writing to the other parties hereto.

IN WITNESS WHEREOF the parties have caused this Loan Agreement to be duly executed the day and year first above written.

SIGNED AND DELIVERED
by
for and on behalf of
HELLENIC BANK PUBLIC
COMPANY LIMITED                                    By    THRASYVOULOU N. (Mr)        GAVRIEL NATASSA
                                                                            Authorised Signatories

SIGNED AND DELIVERED
by
for and on behalf of
ORIENT ALLIANCE SHIPPING COMPANY
LIMITED                                                         By
                                                                                              Attorney

**Acknowledgements and Consents**

We, Interorient Navigation Company Limited of Limassol, Cyprus hereby acknowledge the terms and conditions of this Loan Agreement and consent and agree to the same. In particular (without limitation), we hereby confirm our agreement to (a) the reduction of the Interorient Overdraft as contemplated by this Loan Agreement, (b) the matters contemplated by Clauses 6(D) and 15(B)(r) and (t) of this Loan Agreement and undertake to abide by the same and (c) our appointment as the Borrower's process agent in Cyprus as provided for in Clause 25 of this Loan Agreement.

By:                                                                  Attorney
For and on behalf of
INTERORIENT NAVIGATION COMPANY LIMITED

We, Orient Tribune Shipping Company Limited of Limassol, Cyprus hereby acknowledge the terms and conditions of this Loan Agreement and consent and agree to the same. In particular (without limitation), we hereby confirm our agreement to the matters contemplated by Clauses 6(D) and 15(B)(t) of this Loan Agreement and undertake to abide by the same.

By: Anthia Savvidou          *Attorney*

For and on behalf of

**ORIENT TRIBUNE SHIPPING COMPANY LIMITED**